**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TWILIGHT TRANSPORT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 19-cv-01253 |
| v. | ) | |
| | ) | |
| GENERAL MOTORS, LLC, | ) | TRIAL BY JURY DEMANDED |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Twilight Transport, Inc. ("Twilight"), by its undersigned counsel, complains of Defendant General Motors, LLC ("GM"), as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Twilight, by its president, David Wilkozek, purchased a 2018 GM 2500 Sierra Crew Cab truck ("the truck") for $56,392 plus various charges, fees, and taxes for a total cash price of $61,333.21. Plaintiff made a $5,000 down payment and financed the remaining balance, making the total sale price of the truck over the life of the loan $71,911.40. Wilkozek purchased the truck in reliance on GM's claim that, as a GM CPO vehicle, the truck passed GM's 172-point inspection and reconditioning process and was therefore of better quality and condition than similar non-CPO vehicles by virtue of having been "certified". Plaintiff would not have purchased the truck had he known that it is a rebuilt wreck worth substantially less than he paid for it and subject to defects the GM CPO extended service contract won't cover.

2.     With regard to GM CPO vehicles, GM claims "[w]e believe in our vehicles and aren't afraid to stand behind them." In reality, GM doesn't stand behind its certification at all if a car is a rebuilt wreck that doesn't actually meet GM's allegedly exacting standards. All consumers

get is a service contract that explicitly excludes coverage for the preexisting accident damage that GM lures consumers into believing its CPO vehicles are free of.

3.     GM's authorized agent certified Plaintiff's truck under the CPO program despite the truck suffering from preexisting damage that should have disqualified for failing at least 21 out of 172 inspection points. After Plaintiff's president notified GM that the truck shouldn't have been certified and requested that it help him unwind the transaction, GM confirmed with the dealer itself that the dealer was aware that the truck had been in an accident, but "certified" it anyway. Nonetheless, GM unfairly refuses to honor the certification, claiming instead that it's the dealer's certification, not GM's.

## PARTIES, JURISDICTION, AND VENUE

4.     Twilight Transport, Inc. is an Illinois corporation with its principal place of business in Roselle, Illinois. It is deemed to be a citizen of Illinois pursuant to 28 USC § 1332(c)(1).

5.     General Motors, LLC is a Delaware limited liability company whose sole member is General Motors Holdings, LLC. General Motors Holdings, LLC is a Delaware limited liability company whose sole member is General Motors Company. General Motors Company is a Delaware corporation with its principal place of business in Michigan. General Motors Company is a citizen of Delaware and Michigan pursuant to 28 USC § 1332(c)(1). General Motors, LLC is therefore a citizen of Delaware and Michigan.

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 USC § 1332 because (a) there is complete diversity of citizenship between the parties, and (b) the amount of controversy exceeds $75,000 exclusive of interest and costs, specifically in excess of $24,000 for the truck's diminished value, charges, taxes, interest incurred and aggravation and inconvenience damages, as well as punitive damages of at least three times actual damages, or in excess of $72,000,000 for total actual and punitive damages of at least $96,000.  Given GM's large

net worth and the egregious pattern of intentional misconduct alleged herein that has harmed consumers for many years which has continued unabated despite repeated suits against GM (and its predecessor) going back at least as early as 2005 for the same misconduct, a multi-million-dollar punitive damages award is warranted.

7.     This court has personal jurisdiction over GM pursuant to 735 ILCS § 5/2-209(a) and (b) in that:

    a.  The conduct complained of was directed to and occurred in Illinois because Plaintiff's principle who participated in the purchase of the truck, Dave Wilkozek

        i.  viewed and relied on GM's representations in its advertisements for the GM CPO program and the truck in Illinois via websites maintained by GM directed at citizens of Illinois (among other states);

        ii.  received fraudulent statements from GM's agent acting on its behalf in Illinois misrepresenting that the truck conformed to GM's certification requirements and that GM had certified the truck; and

        iii.  telephoned GM from Illinois to participate in conversations in which GM continued its pattern of unfair and deceptive conduct toward Plaintiff;

    b.  GM conducts a substantial amount of business in and purposefully directed at Illinois, in that:

        i.  GM advertises and markets its vehicles and parts using websites registered with the Internet Corporation for Assigned Names and Numbers in its own name and directed at citizens of Illinois, such as

https://gmcertified.com, https://www.gm.com,

https://www.chevrolet.com, https://www.gmc.com,

https://www.buick.com, and https://www.cadillac.com;

ii. GM advertises and markets its vehicles in print, television, and radio advertising spots within Illinois and directed at citizens of Illinois;

iii. By itself and through its various predecessors in interest, GM pioneered the American automotive industry practice of utilizing independent franchisees and distributors, and has for more than 100 years maintained an extensive system of such franchisees and distributors located within Illinois as its agents authorized to sell and service its various lines of GM vehicles and parts, including GM CPO vehicles;

iv. GM presently maintains hundreds of contractual relationships with franchisees and distributors located within Illinois through which it sells and services its various lines of GM vehicles and parts, including GM CPO vehicles;

v. On information and belief, GM makes efforts to comply with the Illinois Motor Vehicle Franchise Act, 815 ILCS § 710/1, *et seq.*, with regard to its relationships with Illinois franchisees and distributors and has voluntarily filed suit in Illinois to litigate its rights under those contracts;

vi. GM maintains numerous contractual relationships with Illinois dealers authorized to conduct CPO inspections on its behalf and participate in extending CPO warranties;

vii. GM voluntarily maintains suit in Illinois federal and state courts;

      viii.   GM owns and/or leases real property located in Illinois, including property on which it conducts business in its own name, such as distributing parts to its Illinois agents;

      ix.   GM directly employs hundreds of individuals in Illinois; and

      x.   GM is qualified, licensed, and authorized to do business in Illinois and maintains a registered agent for purposes of accepting service of process in Illinois.

8.     Venue is proper in this judicial district pursuant to 28 USC § 1391(b)(1) because General Motors is subject to personal jurisdiction in this judicial district and pursuant to 28 USC § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims arose in this judicial district.

## THE GM CERTIFIED PRE-OWNED PROGRAM

9.     GM maintains the "Certified Pre-Owned" ("CPO") program, through which it and authorized dealers sell used cars GM represents have gone through what it claims is a strict evaluation to determine whether they meet GM's premium manufacturing standards in order to earn the GM "certified" title, and therefore qualify for what GM represents are additional benefits.

10.     GM represents that in order to qualify to be CPO, a vehicle must be a Chevrolet, Buick, or GM with less than 75,000 miles, be less than 6 model years old, have a clean title, and pass a 172-point vehicle inspection and reconditioning process.

11.     GM delegates the pre-sale vehicle inspection and reconditioning process to dealers authorized to conduct inspection and reconditioning on its behalf, with which it maintains contractual relationships determining their obligations under the GM CPO program.

12.     GM maintains the right to supervise and direct its agents with respect to the CPO program and creates and supplies all materials provided to purchasing consumers, as well as

instructions, checklists, and training materials used by dealers participating in the GM CPO program.

13.    West Point Buick GMC ("West Point"), the Texas dealer from which Plaintiff purchased the vehicle that is the subject of this lawsuit, was at all relevant times an agent of GM for the purpose of conducting the GM Certified Pre-Owned inspection and reconditioning process, and participating in issuing the GM Certified Pre-Owned extended warranty. West Point was acting within the scope of its duties to GM and under the direct supervision of GM.

14.    Subsequent to the sale, GM became aware of and ratified the conduct of West Point Buick GMC in certifying the truck as conforming to the allegedly strict criteria of the GM CPO program.

15.    GM claims that its 172-point inspection is one of the most comprehensive in the industry and that GM CPO vehicles are inspected and reconditioned by authorized trained technicians to strict, factory-set standards to ensure that every vehicle's engine, chassis, and body are in excellent condition. CPO vehicles also must be road-tested, put up on a lift for a complete underbody and frame inspection, and then completely checked for any cosmetic flaw. GM claims "we check just about everything — from the A/C to the shocks, right down to the floor mats and the undercarriage. It's the Certified difference." GM claims a CPO vehicle must meet each of its standards or it won't be certified.

16.    GM represents to customers that CPO vehicles are certified by GM according to its standards and, by virtue of having passed its 172-point inspection and reconditioning process, are of a superior quality and condition than similar non-certified vehicles that did not pass GM's 172-point vehicle inspection and reconditioning process.

17. GM claims that if and only if a vehicle meets its standards will it receive CPO certification, which GM represents entails the following benefits:

    a. the consumer gets the "peace of mind" knowing that his vehicle passed GM's 172-point inspection and reconditioning process;

    b. GM extends the remaining factory warranty by 12 months or 12,000 miles, whichever comes first;

    c. GM provides an additional 6 year or 100,000 mile powertrain warranty;

    d. GM provides access to a maintenance program, including two scheduled maintenance visits over two years, oil changes, tire rotation, and some unspecified "multi-point" inspections;

    e. GM provides roadside assistance;

    f. GM provides the purported right to "exchange" the vehicle for another new or CPO GM vehicle within 3 days or 150 miles;

    g. GM provides a period of promotional access to OnStar and SiriusXM satellite radio; and

    h. A CARFAX vehicle history report.

18. GM claims "[w]e've got nothing to hide" and that the value of its vehicle history report is that buyers can be sure they are not purchasing a vehicle with hidden past problems such as accidents, and can "know what your vehicle went through", and "[m]ake sure you know what you're getting".

19. GM further represents that "[w]e believe in our vehicles and aren't afraid to stand behind them."

20.     In actuality, with regard to vehicles with undisclosed preexisting accident damage, GM refuses to stand behind the affirmative representations it makes about the condition and quality of such a vehicle as having passed its 172-point inspection and reconditioning process. This is so even when GM's agent certifies a vehicle had been in an accident and still suffered costly, unrepaired or inadequately repaired accident damage that should have disqualified it from being certified as CPO. Instead, all a purchasing consumer gets is an expensive extended service contract that explicitly doesn't cover the damage GM leads consumers to believe its extensive certification and reconditioning process is supposed to guard against.

**PLAINTIFF'S PURCHASE OF A CPO 2018 GMC 2500 TRUCK**

21.     Twilight's President, David Wilkozek, was interested in purchasing a new or CPO 2018 Chevrolet Silverado or GMC Sierra 2500 truck for Twilight to use in its freight hauling business and used GM's CPO website, https://www.gmcertified.com, to search and view advertisements for GM vehicles offered for sale as part of the GM CPO program.

22.     On September 13, 2018, Wilkozek used GM's CPO website to find a 2018 GMC Sierra 2500HD SLT Crew Cab truck ("the truck") that met his criteria offered for sale by West Point GMC Buick of Houston, Texas ("West Point").

23.     Wilkozek first contacted West Point by phone on September 13, 2018 and spoke with salesperson Mehran Abedini, with whom he discussed the condition and price of the vehicle. Wilkozek specifically asked Abedini whether the truck had ever been in an accident because he wanted to purchase a new or as-new truck.

24.     Abedini knew it was important to Wilkozek that the truck be accident-free, and stated that Wilkozek could be assured that it had never been in an accident because the CARFAX Vehicle History Report showed no accidents and because it passed GM's 172-point inspection in order to be certified as CPO.

25. In actuality, the CARFAX report on GM's website was inaccurate and GM should not have certified the truck because its 172-point inspection would have revealed that the truck had been in at least two accidents and suffered from unrepaired or inadequately repaired damage that should have disqualified it from the GM CPO program.

26. Wilkozek reasonably believed GM's representations that no vehicle that had preexisting unrepaired or inadequately repaired accident damage could pass GM's CPO inspection without being reconditioned to GM's standards.

27. Based on GM's representations about the CPO program and the truck's quality and condition by virtue of having been certified as CPO, Wilkozek agreed to purchase the truck and on or about September 18, 2018 executed on Twilight's behalf a purchase agreement calling for

    a. $56,392 for the cash price of the truck;

    b. $399 for "Security-Guard";

    c. $3,986 for "State Sales Tax";

    d. $155.70 for "Lic. Transfer & Reg";

    e. $95 for "Title";

    f. $30 for "Insp.";

    g. $150 for "Documentation Fee"; and

    h. a down-payment of $5,000, which Wilkozek paid in two installments of $1,000 by credit card and $4,000 by wire transfer.

28. West Point arranged for Plaintiff to finance the remainder of the purchase with GM's wholly owned finance company, Ally Financial, formerly known as General Motors Acceptance Corporation.

29.     Plaintiff received the truck by freight on October 8, 2018 and immediately drove it to get washed, when he observed a substantial amount of water entering the cabin near the passenger side door handle. Wilkozek also noticed rattling coming from behind the headliner and the passenger sun visor stained with grease.

30.     That same day, Wilkozek took the truck to area GM dealer Napleton's Schaumburg Buick GM for warranty inspection and repair. Napleton's repaired the door handle but had to order a visor.

31.     Wilkozek brought the truck back to Napleton's to get the visor installed and again on October 20, 2018 because he started noticing other problems with the vehicle indicating unrepaired or inadequately repaired accident damage, including misaligned body panels, paint flaws, and broken glass under the seats. Napleton's could not perform warranty repair on damage it noted: paint overspray and defects, front fenders and hood misaligned relative to the front doors, and a missing VIN tag from the driver's door frame. Napleton referred Plaintiff to its preferred body shop, Woodfield Collision Center, for further inspection, and recommended Wilkozek contact GM customer service.

32.     On October 20, 2018, Wilkozek called the GM customer service number and advised GM employee Jamie that he started finding evidence that the truck had been in an accident, contrary to GM's representations by virtue of certifying it under the GM CPO program, and that the wanted to unwind the deal. Jamie advised that GM would take approximately 1 week to investigate and get back to him.

33.     On October 24, 2018, Wilkozek contacted West Point and spoke with "Pre Owned Manager" Leroy Seals. Wilkozek informed him of the numerous problems with the truck he'd discovered so far and asked that West Point return his money and help him unwind the deal. Seals

10

stated that he would do nothing to help Plaintiff and had to speak with his superiors at the dealership.

34.     On October 25, 2018, Wilkozek telephoned West Point and spoke with Seals' supervisor, "Pre Owned Director" Richard Confer. Wilkozek again described the numerous problems with the truck he'd discovered so far and asked that West Point return his money and help him unwind the deal.

35.     Confer claimed he personally knew the previous owner of the truck and had personal knowledge that the truck had never been in an accident, instead blaming all damage on the transport company that hauled the truck from Houston to Chicago. Confer refused to return Plaintiff's money and unwind the deal.

36.     On November 2, 2018, Woodfield provided Wilkozek with $7,100.47 partial estimate for repair of damage that directly corresponds to seven out of twelve points listed in GM's CPO inspection checklist with respect to which GM's agent checked "inspection completed", including paint imperfections, misaligned body components, damaged and missing nameplates, and misaligned molding.

37.     Also, on November 2, 2018, Wilkozek spoke with GM customer service agent Jamie, who advised him that GM's regional manager for the Houston area contacted West Point regarding Wilkozek's concerns and had spoken with West Point's used car manager, who admitted that he was aware the vehicle had been in an accident prior to sale. Nonetheless, Jamie stated that GM would do nothing to help Plaintiff with respect to the truck.

38.     In all, the truck should have failed at least 21 out of 172 items on GM's 172-point CPO inspection checklist, including

a.  the Carfax report indicates two incidents that caused damage to the truck and required towing, yet GM's agent didn't investigate further and marked "PASS" on GM's checklist;

b.  the front bumper shows signs of adjustment and is misaligned;

c.  the hood and roof have been inadequately repaired and poorly painted;

d.  some emblems and nameplates are missing;

e.  door moldings require replacement;

f.  front fenders are misaligned and poorly painted;

g.  the front door hinges were inadequately replaced and both doors are misaligned and poorly painted;

h.  improperly installed door handles;

i.  the sunroof does not open completely and does not close without manual assistance;

j.  the headliner is smudged with grease, damaged, and misaligned;

k.  The right center door pillar and interior trim panels are misaligned, and fastener covers are damaged;

l.  the sunroof and headliner area rattle;

m.  exhaust sound is louder inside the right side of the passenger cabin than the left;

n.  the exterior wasn't detailed, as the fenders are missing their chip guards and have numerous paint defects; and

o.  the interior wasn't detailed, as the headliner was smudged with grease, there was broken glass under the seats, and interior trim panels and fastener covers are damaged.

39. As a result of the prior accident history and damage, the truck was worth about $40,000 at the time of purchase (approximately $16,392 less than what Plaintiff paid). Plaintiff therefore paid about $16,392 more than the truck was worth, as well excess sales tax and interest on that amount, and additional fees it would not have otherwise incurred bringing his actual damages to over to over $21,000 excluding aggravation and inconvenience damages of at least $3000.

## COUNT I
**(Illinois Consumer Fraud and Deceptive Business Practices Act — deception)**

40. Plaintiff repeats and realleges Paragraphs 1 - 39.

41. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS § 505/2, provides in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce and hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

42. Section 10a of the Consumer Fraud Act, 815 ILCS § 505/10a further provides:

> Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.

43. The misconduct alleged occurred in the conduct of trade or commerce within the meaning of Section 1(f) of the Consumer Fraud Act because it occurred in the advertising, offering for sale, and sale for cash or credit of tangible personal property.

44. Plaintiff is a person within the meaning of Section 1(c) of the Consumer Fraud Act because it is a corporation, and is a consumer within the meaning of Section 1(e) of the Consumer Fraud Act, because it purchased the truck for its own use.

45.     Plaintiff's president, David Wilkozek, visited GM's CPO website prior to purchase and viewed GM's advertisements for the GM CPO program and GM and West Point's advertisement for the truck itself, including GM's representation that the truck, by virtue of being a GM CPO vehicle, passed GM's 172-point inspection and reconditioning, and therefore had no preexisting unrepaired or inadequately repaired accident damage.

46.     At the time of sale, Wilkozek reasonably believed GM's representations that no vehicle that had preexisting unrepaired or inadequately repaired accident damage could pass GM's CPO 172-point inspection without being reconditioned to GM's standards.

47.     At the time of sale, Plaintiff believed that the truck had no preexisting unrepaired or inadequately repaired accident damage because it was represented by GM to have been reconditioned and passed an inspection that would have flagged accident damage from which the truck suffers.

48.     By causing Plaintiff to be presented with its written and internet CPO materials and advertising the truck as CPO on its website, GM deceptively misrepresented that it was certifying the vehicle, that the vehicle met the 172-point vehicle inspection, that GM would stand by the certification and that it was a GM and not a GM used car dealer certification.

49.     GM does not stand by its certification when a vehicle does not meet its criteria for certification but at all relevant times concealed this fact from consumers, including Plaintiff. GM refused to stand behind its certification when it discovered that Plaintiff's vehicle did not meet the criteria for being certified. GM has engaged the deceptive pattern and practice for over a decade of misrepresenting that its certification is a GM certification when in fact when a problem arises it takes the position as part of a uniform company-wide policy that it is only a GM used car dealer certification which GM does not stand behind.

14

50.     If GM had disclosed its true but concealed intent not to stand behind the GM CPO certification and that it wasn't in fact a Gm certification but only a GM used car dealer certification, Plaintiff would not have purchased the truck.

51.     By advertising the truck on the CPO website, GM represented to Plaintiff that the vehicle had undergone and passed the 172-point inspection and at the time of sale, met the stringent standards required to be certified. GM also represented in the Vehicle History Report for the truck it supplied on the CPO website, which Plaintiff viewed prior to purchase, that the vehicle had been in no accidents.

52.     GM's representations on the CPO website and in materials it provided to West Point to use in connection with the sale that the truck had been properly inspected prior to certification, satisfied GM's stringent inspection, and had not been in an accident, were false  because the vehicle had been in at least one serious accident and suffered from unrepaired or inadequately repaired damage that should have been revealed by GM's inspection.

53.     Despite promising that the truck would meet the standards and procedures of its CPO program, GM permitted an un-certifiable vehicle to be sold at a premium under the GM CPO moniker to Plaintiff. When Plaintiff's vehicle was discovered to have been improperly certified, GM refused to stand behind the certification and did not offer to unwind the deal.

54.     In sum, GM created a marketing campaign targeted to Plaintiff and other consumers whereby it deceptively advertised the truck as a "GM" CPO vehicle as opposed to what it really was: a local used car dealership certified pre-owned vehicle that did not meet GM's stringent certification standards, had been in at least one accident, had many unrepaired or inadequately repaired defects, and was worth far less than the selling price.

55. These misrepresentations were material to Plaintiff's purchase decision as it would never have purchased the truck had it known the truth regarding the misrepresentations and omissions set forth herein, and that the truck had been in at least one serious accident and was worth substantially less than what Plaintiff paid for it.

56. As a direct and proximate result of GM's material misrepresentations and omissions, as alleged above, Plaintiffs suffered damages in excess of $21,000, as well as aggravation and inconvenience damages in an amount to be determined by a jury in excess of $3000.

57. GM's material misrepresentation and omissions were willful and wanton thus allowing for a punitive damage award of at least 3 times actual damages or well excess of $72,000. GM or its predecessor has been sued before for the identical misconduct starting as early as 2005 in *Butera v General Motors Corp.* and again in 2015 in *Sheltons v General Motors LLC*. The earlier lawsuits involved the same pattern of fraudulent conduct and deceptive policies and practices as alleged herein. Despite being sued repeatedly GM has allowed this fraud to continue unabated for at least a decade and half and probably much longer harming thousands of unwitting consumers. GM generates hundreds of millions of dollars in profits directly and indirectly due to the fraudulent CPO program both in increased prices for new cars (as the CPO program increases trade-in value for used GM cars) and in revenues generated by charging its dealers to have a used vehicle certified. This pattern of misconduct given GM's large net worth and the egregious nature of this knowing misconduct, which has continued unabated since at least 2005, warrants a multi-million-dollar punitive damages verdict in an amount to be determined by the jury. Only a large punitive damages verdict will put a stop to this very profitable and long standing fraud.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor

and against GM as follows:

     a.   Awarding Plaintiff its actual damages;

     b.   Awarding Plaintiff punitive damages;

     c.   Awarding Plaintiff its attorneys' fees and costs; and

     d.   Awarding Plaintiff such further relief as the Court deems proper and just.

## COUNT II
### (Illinois Consumer Fraud and Deceptive Business Practices Act — unfairness)

58.    Plaintiff repeats and realleges Paragraphs 1-39.

59.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act

("Consumer Fraud Act"), 815 ILCS § 505/2, provides in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce and hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

60.    Section 10a of the Consumer Fraud Act, 815 ILCS § 505/10a further provides:

Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.

61.    The misconduct alleged occurred in the conduct of trade or commerce within the

meaning of Section 1(f) of the Consumer Fraud Act because it occurred in the advertising, offering

for sale, and sale for cash or credit of tangible personal property.

62.    Plaintiff is a person within the meaning of Section 1(c) of the Consumer Fraud Act

because it is a corporation, and is a consumer within the meaning of Section 1(e) of the Consumer

Fraud Act, because it purchased the truck for its own use.

63. Despite claiming that it's "not afraid" to stand behind CPO vehicles, the GM CPO certification itself provides no value to consumers with regard to the very types of unrepaired or poorly repaired accident damage that GM's stringent inspection and reconditioning process is supposed to catch because the extended service contract GM provides alongside the certification explicitly excludes preexisting damage and accident damage and GM will not intervene to unwind deals for the sale of vehicles that shouldn't have been certified.

64. GM's agreements with its agents allow it take action against dealers that fail to abide by their obligations under the CPO program, yet GM persistently refuses to unwind deals for consumers who have been harmed by deceptive and unfair conduct that violates GM's own agreements with its dealer agents.

65. GM's conduct in systematically refusing to stand behind its CPO certifications with respect to vehicles that suffer from unrepaired or inadequately repaired accident damage is unfair in that:

    a.   it constitutes a long standing and pervasive breach of Illinois' public policy by unjustly enriching GM to the extent that dealers pay money to GM in order to certify vehicles under the CPO program according to GM's standards;

    b.   it is immoral, unethical, oppressive and unscrupulous because consumers only learn that a certification purporting to guarantee that a vehicle is free of costly unrepaired or inadequately repaired accident damage is worthless, despite GM having been paid for the certification, after purchase when GM refuses to stand behind its certification, as happened to Plaintiff;

    c.   it is also immoral, unethical, oppressive, and unscrupulous in that GM confirmed with the used car sales manager of the dealer that sold the truck to

Plaintiff that it had been involved in an accident, yet refused to honor its certification, leaving Plaintiff no choice but to accept GM's unlawful behavior or file suit; and

d. it causes substantial injury to consumers to pay a premium price for a GM CPO vehicle, believing GM's claims that such vehicles passed an extensive inspection and reconditioning process, only to receive an extended service contract that doesn't cover the exact damage GM's inspection and reconditioning process is intended to weed out.

66. GM's unfair conduct in this instance and with regard to similarly situated consumers is willful and wanton thus allowing for a punitive damage award of at least 3 times actual damages or well excess of $72,000. GM or its predecessor has been sued before for the identical misconduct starting as early as 2005 in *Butera v General Motors Corp.* and again in 2015 in *Sheltons v General Motors LLC*. The earlier lawsuits involved the same pattern of fraudulent conduct and deceptive policies and practices as alleged herein. Despite being sued repeatedly GM has allowed this fraud to continue unabated for at least a decade and half and probably much longer harming thousands of unwitting consumers. GM generates hundreds of millions of dollars in profits directly and indirectly due to the fraudulent CPO program both in increased prices for new cars (as the CPO program increases trade-in value for used GM cars) and in revenues generated by charging its dealers to have a used vehicle certified. This pattern of misconduct given GM's large net worth and the egregious nature of this knowing misconduct, which has continued unabated since at least 2005, warrants a multi-million-dollar punitive damages verdict in an amount to be determined by the jury. Only a large punitive damages verdict will put a stop to this very profitable and long standing fraud.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against GM as follows:

      a.   Awarding Plaintiff its actual damages;

      b.   Awarding Plaintiff punitive damages;

      c.   Awarding Plaintiff its attorneys' fees and costs; and

      d.   Awarding Plaintiff such further relief as the Court deems proper and just.

TWILIGHT TRANSPORT, INC.

By:  /s/ Jason G. Shanfield
        One of its attorneys

Peter S. Lubin
Jason G. Shanfield
LUBIN AUSTERMUEHLE, PC
360 West Butterfield Rd, Suite 325
Elmhurst, IL 60126
630-333-0333
peter@l-a.law
jason@l-a.law

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to FRCP 38(b), Plaintiffs request a trial by jury on the claims so triable.

TWILIGHT TRANSPORT, INC.


By: _ /s/ Jason G. Shanfield _
One of its attorneys

Peter S. Lubin
Jason G. Shanfield
LUBIN AUSTERMUEHLE, PC
360 West Butterfield Rd, Suite 325
Elmhurst, Illinois
630-333-0333
peter@l-a.law
jason@l-a.law